IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,
:
    Plaintiff,

v.                      :     Case No. 3:18-cr-76

JASON MARSHALL,           JUDGE WALTER H. RICE

    Defendant.           :

---

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS (DOC. #26)

---

Defendant Jason Marshall was indicted on three counts: (1) felon in possession of a firearm; (2) possession with intent to distribute heroin; and (3) possession with intent to distribute cocaine. Doc. #23. This matter is currently before the Court on Defendant's Motion to Suppress all tangible evidence seized by the Government on April 2, 2018, and any statements made by Defendant. Doc. #26. The Court held hearings on the Motion to Suppress on September 12, 2018, October 2, 2018, and October 24, 2018.

I.     **Background and Procedural History**

The Southern Ohio Fugitive Apprehension Strike Team ("SOFAST"), a task force comprised of federal and state law enforcement officers, had an arrest warrant for Ollie Arnold, III, *a.k.a.* "OJ." OJ, a convicted felon, presumed to be

dangerous, was wanted on drug trafficking charges. On April 2, 2018, acting on a tip from a confidential source, approximately six SOFAST officers went to look for OJ at the home of Tiffany Rodgers, located at 4612 Prescott Avenue in Dayton. Rodgers was the girlfriend of OJ's brother, Defendant Jason Marshall, who is also a convicted felon. The confidential source allegedly told an FBI agent that OJ recently had been observed at Rodgers' house. The agent passed this information on to SOFAST Detective Joey Myers.

When the task force officers arrived at Rodgers' home between 6:00 and 7:00 in the morning, Marshall and Rodgers were asleep in the upstairs bedroom. Detective Myers, along with Detective Thomas Oney, approached the front door of the residence. The other task force officers, including United States Deputy Marshal Ivan Garcia, were stationed around the outside of the house. All were dressed in tactical gear and body armor. All were armed, and at least one officer had an assault rifle.

Myers testified that, when he and Oney approached the front porch, they did not have their guns drawn. Doc. #32, PageID#73. Myers knocked loudly on the front door and identified himself as a police officer. Within seconds, Jason Marshall opened the front door. Myers was familiar with Marshall from an earlier attempt to locate OJ at a different residence. Oney testified that Myers told Marshall that they had an arrest warrant for OJ. *Id.* at PageID#157. Myers, however, denies mentioning anything about an arrest warrant. *Id.* at PageID#100. Myers told Marshall that he was acting on a tip, and asked if OJ was there.

2

Marshall allegedly responded, "No, come on in and check." *Id.* at PageID#73. Oney likewise testified that Marshall said that the officers could come in and look for OJ. *Id.* at PageID#145.

At Marshall's invitation, Myers, Oney, Garcia and a couple of the other SOFAST officers entered the house. Myers stayed downstairs with Marshall while the other officers began searching downstairs for OJ. Rodgers came downstairs and joined Marshall, sitting next to him on the couch in the living room. Myers explained that they were only there looking for OJ. The officers all testified that neither Marshall nor Rodgers objected to the search. *Id.* at PageID##75, 108, 134, 146.

Within minutes, Deputy Garcia and Detective Oney spotted two firearms in plain view in one of the upstairs bedrooms. When Garcia looked through a large hole in the wall leading from the closet into the attic crawlspace, he saw the silver barrel of another rifle. Govt. Ex. 1. They called for Myers, who went upstairs to see what they had found. Myers viewed the weapons and also saw a small, clear baggie suspected to contain powdered cocaine. Govt. Exs. 2 and 3.

When Myers came back downstairs, Marshall asked what was going on. Myers said, "We found some stuff I just can't walk away from." Marshall responded, "I did hide some guns." Doc. #32, PageID#80. At that point, Myers asked Marshall and Rodgers for consent to search the house for other contraband. Both refused to consent. *Id.* at PageID##80-81.

3

Myers then called Detective Jason Barnes, who swore out a search warrant for the house. Barnes' affidavit stated that, while searching for OJ, the officers had discovered weapons and a baggie containing a white substance in plain view. That substance tested positive for cocaine. Govt. Exs. 4 and 5. Marshall and Rodgers were detained and eventually placed in police cruisers and taken to be questioned. Marshall confessed to Detective Barnes that the guns and drugs belonged to him. After the search warrant was signed by a judge, officers continued to search the house and discovered several other weapons, more cocaine, heroin and a large amount of cash.

Marshall's version of what happened on the morning of April 2, 2018, is somewhat different. Rodgers had surveillance cameras at her front and back doors, with a monitor in the bedroom. When Marshall heard the officers banging on the front door, screaming that they had an arrest warrant, he looked on the monitor and saw the SOFAST officers, armed with assault rifles and handguns. He recognized Detective Myers from the previous encounter and knew that they were there looking for his brother. Doc. #33, PageID##195-98.

Marshall testified that he ran downstairs because he did not want the officers to disturb Rodgers' neighbors. In addition, he knew from past experience that if he did not respond quickly, the officers might kick the door down. Marshall testified that he opened the front door, but not the screen door. According to Marshall, Myers had his handgun drawn, but it was not pointed at him. Doc. #33, PageID##195, 198-99, 203. Marshall immediately put his hands up to show the

4

officers that he was willing to cooperate. Marshall testified that Myers asked him if OJ was there. When Marshall responded, "You know he's not here," Myers told him to open the screen door. *Id.* at PageID#205.

Marshall denies that he invited the officers in. He explained that he would not have done that because he knew that there were guns in plain view upstairs and he had not had time to hide them. Marshall testified "I was trying to stop them from kicking in the door because at that point I knew they were going to search and I was going to jail anyway." *Id.* at PageID#221. In his view, regardless of whether he gave consent, the officers were going to come in and search. "You can either be in a standoff with the U.S. Marshals or you can let them come in and do the[y] job. My thing was to show him that I'm not being resistant. . . . I knew I can get shot. When he told me to open up the door, I wasn't going to just tell him nah, get away from here, because that's going to be a standoff situation." *Id.* at PageID#243. Marshall testified that, when Myers told him to open the door, he unlocked the screen door, and pushed it open to let them in. *Id.* at PageID#205.

Marshall sat on the couch as he was instructed to do. He told Myers that Tiffany Rodgers was upstairs. Marshall observed one of the officers with an assault rifle open the door leading upstairs, point the rifle up the stairs and yell at Tiffany to put some clothes on. She was screaming, "What [is] you all doing in my house? Why you let them in my house?" *Id.* at PageID##207-08. She put a robe on and came downstairs with her cell phone to sit on the couch next to Marshall.

5

According to Marshall, Myers asked him if they could search the house. When Marshall told him that it was not his house so he could not give consent, Myers asked Rodgers for consent. She asked him why the officers were there. Myers explained that they were looking for OJ, and asked her if they could search the house for him. She refused to consent. *Id.* at PageID##210-11.

Marshall testified that, when Rodgers said that she was going to call her lawyer, Myers took the cell phone from her and placed it on the table. Myers was then summoned upstairs. When Myers returned, he said that they had found "something I can't walk away from." Marshall told Rodgers that they must have gone into the closet, and asked her not to get mad. *Id.* at PageID#214. According to Marshall, Myers then asked her if they could search the rest of the house. She refused. He said that he would call and get a search warrant. *Id.* Marshall and Rodgers were then removed from the house and taken to police cruisers. Marshall was later taken downtown for questioning, and read his *Miranda* rights.

Tiffany Rodgers also testified at the hearing. She testified that, early in the morning of April 2, 2018, while she was still in bed, she heard people kicking and banging the front door, saying, "Open up the fucking door. It's the U.S. Marshals." Doc. #34, PageID#276. On the monitor, she observed several officers with big guns. Jason Marshall went downstairs to answer the door. Rodgers did not hear any of his conversation with the officers. *Id.* at PageID#306.

Rodgers then got out of bed and walked to the top of the stairs. She saw an officer downstairs with a big gun pointed up in the air. *Id.* at PageID#281. She

6

asked him why he was in her house, but he did not answer. *Id.* at PageID#282. She testified that she put on a robe, grabbed her cell phone and started recording as she walked downstairs. She asked them if they had a search warrant and told them all to leave her house. *Id.* at PageID##283-84. Myers allegedly told her that she could not record on her phone. *Id.* She sat on the couch next to Jason and asked him why he opened the door. He did not respond. *Id.* at PageID#286. Rodgers testified that she was upset at Jason for opening the door and letting the officers in. *Id.* at PageID#297.

When she started to call her attorney, Myers allegedly told her to put her phone down. *Id.* at PageID#288. She continued to ask why they were in her house. They told her they were looking for somebody. *Id.* at PageID#289. After Myers went upstairs and came back down, he allegedly took her phone away and put in on the table. *Id.* at PageID##290-91. Myers denies this. Doc. #32, PageID#109. Myers told them that they had found a gun and some drugs upstairs. Doc. #34, PageID##292-93. Contrary to Marshall's testimony, Rodgers denies that Myers then asked for permission to search the whole house. *Id.* at PageID#292. She testified that, only after she and Marshall were placed in police cruisers, Myers asked her for permission to search the house, but she refused. *Id.* at PageID#293. She was transported downtown, detained for a short period of time and then released. No charges were filed against her.

Rodgers discovered that her cell phone had been seized during the execution of the search warrant. She was able to retrieve it from the police a couple of days

7

later. She alleges that she then discovered that the recordings that she had made the morning of the search were no longer on her phone. She testified that she lost that cell phone three or four weeks later and no longer has it. *Id.* at PageID##295-97, 309-10.

II. **Motion to Suppress (Doc. #26)**

In his Motion to Suppress, Defendant Marshall argues that neither he nor Rodgers gave consent for the SOFAST officers to search the house for OJ. In the alternative, Defendant argues that, given the very mission of the SOFAST team and the manner in which they perform their duties, any request by SOFAST for consent to search is inherently coercive. Defendant maintains that, because the initial search was unlawful, all tangible evidence seized and all statements made thereafter should be suppressed as fruit of the poisonous tree.[1]

---

[1] At the hearing, Marshall appeared to mount a challenge to the scope of the initial search, testifying that all of the money and drugs that were found in the attic crawlspace had been stored in a bag hidden under insulation several feet from the rifle that Deputy Garcia allegedly observed in plain view. Doc. #33, PageID##218-19. Marshall testified that he told Myers, "You're going to have to explain to me why you were looking for OJ in a bag." *Id.* at PageID#231. He also told him, "I got you all beat. You all searched the house illegally and you all looked in the bag when all you had was an arrest warrant." *Id.* at PageID#235. Nevertheless, because the Motion to Suppress is limited to the issue of consent, and does not challenge the scope of the initial search, the Court does not address this issue. The Court notes that Myers testified that, when he went upstairs, the small baggie of cocaine was lying next to the rifle, as depicted in Government Exhibits 2 and 3, and that, to the best of his knowledge, no one had moved the cocaine from where it was initially discovered. Doc. #32, PageID##110-11.

8

The Fourth Amendment protects against unreasonable searches and seizures. With certain exceptions, a warrantless search is considered to be *per se* unreasonable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). One of those exceptions is voluntary consent. If the officers obtain a valid consent to search, no warrant is required. *Id.*

The SOFAST officers had an arrest warrant for OJ, but did not have a warrant to search for him in Rodgers' house. It appears to be undisputed that, because the SOFAST officers were acting on an uncorroborated tip and did not have either a reasonable belief or probable cause to believe that OJ was present at Rodgers' house on the morning of April 2, 2018, they could not enter the house to look for him unless they first obtained voluntary consent to do so. *See United States v. Hardin*, 539 F.3d 404, 426 (6th Cir. 2008). Detective Myers, in fact, testified that if he had not obtained consent, the SOFAST team could not have entered Rodgers' residence. Doc. #32, PageID##104-05.

The government has the burden of proving, by a preponderance of the evidence, that "the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) (quotation omitted). In determining whether consent was validly given, the court must consider the "totality of the circumstances," taking into account factors such as the defendant's "age, intelligence, and education; whether he understood the right to refuse consent to search; and whether he understood his constitutional rights." *Id.* Other factors to

be considered include "the length and nature of the detention, the use of coercive or punishing conduct by the police, and indications of more subtle forms of coercion that might have affected [the defendant's] judgment." *Id.*

In this case, Myers and Oney each testified that, when they asked Marshall if OJ was there, he told them "no," and then *invited them to come in* and look for themselves. Marshall argues that, it would have made no sense for him to do this because, as a convicted felon, he was not allowed to possess firearms and he knew that there were several firearms in plain view in the upstairs bedroom. According to Marshall, when he told Myers that OJ was not there, Marshall *told him* to open the door.

Regardless of who is deemed more credible, Marshall *admits* that, after he told the officers that OJ was not there, he unlocked the screen door and pushed it open to let the officers in. Based on this admission, the Court finds that Marshall unequivocally and specifically consented to the search, if not expressly, then at least impliedly. *See United States v. Gamez*, 389 F. Supp. 2d 975, 979 (S.D. Ohio 2005) (noting that consent to search "may be in the form of words, gesture or conduct.").

The only question is whether Marshall's consent was voluntarily given or whether it was the product of coercion. The Sixth Circuit has held that "mere acquiescence does not suffice to establish free and voluntary consent." *United States v. Moon*, 513 F.3d 527, 538 (6th Cir. 2008). If someone consents to a search only because he or she believes that any resistance to the officers'

authority would be futile, then the consent is not voluntarily given. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Nevertheless, "a defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police." *United States v. Herrera*, 733 F. App'x 821, 825 (6th Cir. 2018) (quoting *United States v. Higgins*, 127 F. App'x 201, 204 (6th Cir. 2005)).

In this case, based on the totality of the circumstances, the Court finds that the Government has proven, by a preponderance of the evidence, that Marshall's consent to search for OJ was not the product of coercion.

Jason Marshall is 46 years old, completed his GED and took some college classes. As the Government notes, he is no stranger to the criminal justice system, having been arrested approximately thirteen times, interrogated and advised of his *Miranda* rights approximately ten times, and convicted on multiple occasions in federal and state court. He also testified that he has been present during previous police raids. Doc. #33, PageID##197, 199, 225, 234.

Based on his previous encounter with Myers, Marshall knew that Myers' only objective was to find OJ. Myers was not targeting Marshall. Marshall was aware that he had the constitutional right to refuse to give consent to search the house for OJ. He was also fully aware that, if he gave consent, the officers' search would be limited to those places where OJ might be found.

Marshall testified that, when he answered the door, his main concern was to be as cooperative as possible so that the SOFAST officers would not shoot him.

11

Yes, he knew that, if he allowed the officers inside, they would discover the firearms that were still in the upstairs bedroom in plain view. He nevertheless determined that this outcome was preferable to the risk of being shot should he not fully cooperate. He therefore made a calculated choice to let the officers in. As the Government notes, during his 30-minute interview at the police station during which he made his confession, Marshall never complained that the officers had gained entry to the house without his consent.

Marshall asks the Court to find that, because SOFAST's mission is to apprehend the most dangerous fugitives, and because they typically surround a house with multiple heavily-armed officers wearing tactical gear and body armor, *any* request by a SOFAST officer for consent to search a residence must be deemed inherently coercive. Marshall maintains that, under the circumstances in which he found himself, no reasonable person would feel free to refuse the request to search. Marshall argues that this is a very different situation from a typical "knock and talk," where a police officer might knock on someone's door, ask a few questions and request consent to search the house.

The Court rejects Marshall's suggestion that the SOFAST officers' very presence is so inherently coercive that no consent could ever be deemed truly voluntary. Admittedly, most people may be intimidated by seeing six heavily-armed officers, dressed in tactical gear and body armor surrounding their house. Nevertheless, as previously noted, Marshall's subjective belief that the officers' conduct was coercive is not enough. There must also be "some objectively

improper action on the part of the police." *Herrera*, 733 F. App'x at 825 (quoting *Higgins*, 127 F. App'x at 204).

Because the SOFAST officers' mission is to apprehend dangerous fugitives, they are heavily armed, wear protective clothing and often travel in large teams. Standing alone, nothing about this is objectively improper. As a matter of public policy, the SOFAST officers should not be deprived of tools available to all other law enforcement officers—the "knock and talk," and the request for consent to search—simply because of the dangerous nature of their mission.

Certainly, the number of officers, the kind of weapons that they carry and the manner in which they are dressed may be considered in determining whether, under the totality of the circumstances, consent was voluntarily given. However, consent is not coerced unless the officers took some action that was objectively improper.

In this case, the officers made no verbal threats to Marshall or to Rodgers. Myers testified that, had Marshall refused consent, "I would have taken the team and we would have left because we had no reason to go in there. So he could have very easily said no and we would have left. We have done it thousands of times, you know." Doc. #32, PageID#104.

Nor did the officers make any physical threats to Marshall or to Rodgers. The mere fact that the officers were armed does not render consent involuntary. *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005). The officers each testified that their weapons were not drawn when they approached the door

13

and asked Marshall for consent to search. Marshall testified that Myers had his weapon drawn, but he admitted that he never pointed it at him. Doc. #33, PageID#203. Detective Oney testified that, after he was inside the house, he probably drew his weapon for protection before he started searching for OJ. Doc. #32, PageID#150. The Sixth Circuit has held, however, that such conduct constitutes "a reasonable precaution, not a coercive gesture." *United States v. Scott*, 578 F.2d 1186, 1189 (6th Cir.1978)).

Marshall also argues that Myers' alleged statement that he had an arrest warrant for OJ contributed to the coerciveness of the search request. The Court disagrees. The Government notes that Marshall already knew about the arrest warrant based on his previous encounter with Myers, and Marshall testified that he knew that is why the officers were there. Moreover, Marshall was fully aware that he had a constitutional right to refuse to let them in to search for OJ.[2] He opened the door and let them in anyway, voicing no objection.

Based on the totality of the circumstances, the Court finds that Marshall's consent to the search was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Lucas*, 640 F.3d at 174.

---

[2] Had the officers told Marshall that they had a warrant to search Rodgers' house for OJ, the situation may be different. *See Bumper v. North Carolina*, 391 U.S. 543, 549 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct [sic] with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.").

The only remaining question is whether Tiffany Rodgers' alleged refusal to consent to the search of her house changes the outcome. Marshall argues that, even if the Court finds that *he* consented to the search, it should find that Rodgers clearly revoked that consent when she demanded that the officers leave her house.

There was conflicting testimony on this topic. The officers each testified that neither Marshall nor Rodgers voiced any objection to the search for OJ. Marshall testified, however, that when Rodgers came downstairs, Myers specifically asked her if they could search the house for OJ and she refused. Rodgers testified that she told all of the officers that they had to leave. She claims that they ignored her and started searching the house.

The Court finds the testimony of Marshall and Rodgers on this point to be not credible. Rodgers insists that she recorded a good portion of this incident on her cell phone, starting when she came down the stairs. Presumably, her demand that the officers leave her home, and her express refusal to consent to the search would have been included on this recording and could have been used to Marshall's advantage. Rodgers claims that any video evidence that she had of the search was deleted from her cell phone before she retrieved it from the police station. At the hearing, she admitted that there may have been a way to restore the deleted video, but she now claims that she lost that cell phone three or four weeks after the incident. Moreover, Marshall testified that, at the time of the search, he did not notice that she was recording anything on her cell phone, but she later told him that she had. Doc. #33, PageID#208.

15

Assuming *arguendo* that Rodgers did tell the officers that they had to leave and could not search the house for OJ, this has no legal effect on the Government's ability to use the evidence seized against *Marshall*, who, as the Court has now found, *did* voluntarily consent to the search of the house. Marshall, as a frequent overnight guest in Rodgers' home, clearly had a legitimate expectation of privacy. *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990). He also had apparent authority to consent to a search of that house. Doc. #33, PageID##75-76. *See also United States v. Kimoana*, 383 F.3d 1215, 1221-22 (10th Cir. 2004); *United States v. Caldwell*, 518 F.3d 426, 430 (6th Cir. 2008).

Marshall cites to *United States v. Ayoub*, 498 F.3d 532 (6th Cir. 2007), in which the court held that "[i]f a potential defendant with self interest in objecting to the search is present and actually objects, then a third party's permission does not suffice for a reasonable search." *Id.* at 537 (citing *Georgia v. Randolph*, 547 U.S. 103 (2006)). Marshall maintains that because Rodgers, a potential defendant with self interest in objecting to the search, actually objected, then his own consent was insufficient.

The Court disagrees. In *Randolph*, the Supreme Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive *as to him*." 547 U.S. at 122 (emphasis added). Applying *Ayoub* and *Randolph* to the facts of this case, assuming *arguendo* that Rodgers objected to the search, the Government could not use against *her* any evidence that was seized, even if Marshall had consented to the search. However, because Marshall had a right to

consent to the search and, in fact, did so, Rodgers' alleged objection has no legal effect on the Government's ability to use *against Marshall* the evidence seized on April 2, 2018.

For the reasons set forth above, the Court OVERRULES Defendant's Motion to Suppress, Doc. #26.

Date: March 8, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE